Filed 10/31/13  P. v. Davis CA6

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>AARON JONATHAN DAVIS,<br><br>    Defendant and Appellant. | H038263<br>(Santa Clara County<br>Super. Ct. No. C1109331) |

Defendant Aaron Jonathan Davis was placed on probation, which was immediately terminated, after he pleaded no contest to possession of a firearm by a felon (Pen. Code, former § 12021, subd. (a)(1)) and possession of ammunition by a felon (Pen. Code, former § 12316, subd. (b)(1)).  He challenges the trial court's denial of his suppression motion and claims that the trial court erred in refusing to hold an evidentiary hearing under *Franks v. Delaware* (1978) 438 U.S. 154 (*Franks*).  We conclude that the trial court did not err in denying his motion without an evidentiary hearing.

## I.  Background

On June 12, 2011, around noon, Tomas Azevedo Batista was at Augustine Park in Milpitas with his girlfriend Lissa Toews and their friend Matthew Salinas.  Batista was intoxicated.  He and Toews encountered a man with a blue nose pitbull, and there was an exchange of words between Batista and the man.  The man walked away with his dog.  A

little later, the man returned without his dog, and more words were exchanged. Other individuals may have been involved. A physical confrontation followed. During this confrontation, which may have been instigated by Batista, the man hit Batista in the head with a hammer several times. Batista suffered a head wound that bled and required him to be taken to a hospital and have stitches.

Milpitas Police Officer Jared Hernandez prepared an affidavit seeking a search warrant for defendant's home and person in connection with the assault on Batista. Hernandez declared in his affidavit that dispatch had received a call at 12:16 p.m. on June 12 reporting a fight in Augustine Park. The caller said that four people were assaulting one person. When police arrived, they found Batista with "obvious blunt force trauma" to his head and abrasions on his stomach. He was "bleeding and appeared to be 'out of it.'" Hernandez stated that Batista "is currently receiving medical treatment and is on a breathing tube for life support."

Hernandez declared that Toews and Salinas had told the police that the "suspect" was "a white male adult, approximately 30 years old, over 200 lbs, with a light goatee and mustache, wearing a black baseball style hat and a white [T]-shirt." The suspect "was seen prior to the assault walking a blue nose pitbull in the park." After exchanging profanities with Batista, the suspect "walked away westbound on Coelho St toward the 200(b[lock])." The suspect "returned within a few minutes" without the dog but with a hammer. The suspect challenged Batista to fight, and Batista approached him. The suspect then attacked Batista with the hammer, hitting him on the head and raking his abdomen with the claw of the hammer. The suspect then "fled westbound on Coelho St."

Hernandez stated that the police had also spoken to "an independent witness, Robert Jacobson," who told them that he had seen the fight "and provided a similar suspect description." In addition, the police talked to "an uninvolved citizen that lived in the area, but expressed a desire to remain anonymous." The police described the suspect

and dog to this citizen, and the citizen "directed" the police "to 255 Coelho St.," which was located west of the park.

The police went to 255 Coelho Street, where they "located a blue nose pit bull loose on the porch, within a contained yard." They also saw "random hammer indentation marks above the garage door." The police determined that defendant owned the home at 255 Coelho Street and that he matched the description of the suspect. Defendant had a history of violence and weapons offenses. The police approached the house and found a "wooded barricade constructed within the yard at the entry." A two-page handwritten note attached to the barricade, which identified its author as defendant, warned that defendant had the right to "kill" anyone setting foot on the property "including law enforcement." A copy of the note was attached to the affidavit. It said, among other things, "I will kill any one who crosses my gate. Or attempts to cross it. Including law enforcement."

Hernandez declared that a photo lineup including a 2007 photo of defendant was shown to Toews, "who was not able to identify" defendant. It was also shown to Salinas, "who refused to cooperate." Jacobson was shown the lineup and said "he was 75% sure" that defendant was the man with the hammer. Jacobson said that the only difference was that the photo of defendant in the lineup had more facial hair than the man he had seen in the park. Because Batista was "in[t]ubated," he could not be shown the lineup. Hernandez believed that the photo used in the lineup was a poor one, and he had subsequently located a better and more recent one that showed significant changes in defendant's appearance.

The warrant sought clothing consistent with witness descriptions (black hat and white T-shirt), a hammer, and any items with blood on them. The warrant was issued at 7:40 p.m. on June 12, 2011. The search was conducted on June 13, and a loaded gun and a magazine containing ammunition were found in the master bedroom of defendant's home.

3

Defendant was charged by information with assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1)), possession of a firearm by a felon, and possession of ammunition by a felon.[1] The assault count was subsequently dismissed by the prosecution "due to proof issues."

Defendant filed a motion to suppress the evidence acquired under the search warrant, to traverse the warrant affidavit, and to obtain a *Franks* hearing. He asserted, based on the police reports and other documents, that Hernandez had made material misstatements in the affidavit and had omitted material facts from the affidavit.[2] The defense argued that if the affidavit had not made the misstatements and omissions it would have failed to establish probable cause to believe that the man with the hammer was defendant and that the man with the hammer committed an assault, rather than merely defended himself against an attack by Batista.

The court denied the motion without an evidentiary hearing. The court found that the misrepresentations and omissions were not "material issues" and would not have "changed the probable cause finding." "[T]here seems to me to be an abundance of evidence of probable cause." "I think a very reasonable conclusion that a hammer may be found there, I think it is not even a close call to be honest."

---

[1] Several special allegations were also alleged as to the assault count.

[2] Defendant's motion was based on a comparison between the affidavit and the police reports, and the motion cited to specific pages and line numbers in the police reports. At the hearing on the motion, the defense stated that it was relying on "the reports that have been attached as exhibits." The prosecutor, however, stated that "the police reports . . . weren't even attached . . . ." The prosecutor also argued that the police reports were not available to Hernandez when he prepared the affidavit. "[T]hey're not necessarily contemporaneous with what the affiant was swearing to the court."

No police reports are attached as exhibits to the motion in the appellate record. The superior court assumed the truth of the defense representations regarding the contents of the police reports. "I accept those offers of proof to be made in good faith." We do likewise.

On the eve of trial, defendant pleaded no contest to both counts. His county jail term was satisfied by credit for time served, and his probation was immediately terminated. Defendant timely filed a notice of appeal.

## II. Discussion

"A defendant has a limited right to challenge the veracity of statements contained in an affidavit of probable cause made in support of the issuance of a search warrant. The trial court must conduct an evidentiary hearing only if a defendant makes a substantial showing that (1) the affidavit contains statements that are deliberately false or were made in reckless disregard of the truth, and (2) the affidavit's remaining contents, after the false statements are excised, are insufficient to support a finding of probable cause. Innocent or negligent misrepresentations will not support a motion to traverse. (*Franks v. Delaware* (1978) 438 U.S. 154, 154-156, 98 S.Ct. 2674, 57 L.Ed.2d 667; *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 988-989, 47 Cal.Rptr.3d 467, 140 P.3d 775.) A defendant who challenges a search warrant based on *omissions* in the affidavit bears the burden of showing an intentional or reckless omission of material information that, when added to the affidavit, renders it insufficient to support a finding of probable cause. [Citations.] In either setting, the defendant must make his showing by a preponderance of the evidence, and the affidavit is presumed valid." (*People v. Scott* (2011) 52 Cal.4th 452, 484.) Probable cause is established if "there is a fair probability that contraband or evidence of a crime will be found in a particular place." (*Illinois v. Gates* (1983) 462 U.S. 213, 238.) "The trial court's decision to not hold a *Franks* hearing is reviewed de novo on appeal." (*People v. Sandlin* (1991) 230 Cal.App.3d 1310, 1316.)

The superior court assumed the validity of the defense's claims that Hernandez had made numerous misrepresentations and omissions, but it found that these misrepresentations and omissions were not material and did not alter the fact that the affidavit was sufficient to support a finding of probable cause. We independently review

5

the superior court's findings assuming, as it did, that the defense's claims regarding misrepresentations and omissions were accurate.

Hernandez misrepresented the nature and extent of Batista's injuries by identifying them as "blunt force trauma" and stating that he had been intubated "for life support." The police reports stated that Batista had suffered lacerations, that he was combative with police, and that he was intubated not for life support but due to his intoxication and agitation.[3] He was not on "life support." Hernandez omitted information suggesting that Batista initiated the confrontation and was the aggressor. Hernandez misrepresented Salinas's description of the confrontation as being the same as Toews's description when in fact Salinas told the police that he did not see the man hit Batista with a hammer. Hernandez omitted portions of Jacobson's statement to the police that depicted Batista as the aggressor and stated that Batista had several compatriots joining him in the confrontation with the man with the hammer before the man hit Batista with the hammer.

Hernandez stated that Toews was not able to identify defendant. He omitted to state that Toews had identified someone other than defendant as looking similar to the man with the hammer. Hernandez declared that Salinas had "refused to cooperate" with the lineup when Salinas had actually been shown the lineup and said he could not recognize anyone in the lineup. Hernandez summarily declared that defendant matched the description of the "assailant" given by "three witnesses." Only Toews described a man assaulting Batista. Neither Toews nor Salinas identified defendant as the man with the hammer, and Jacobson described Batista as the aggressor. Two other witnesses also described Batista as the aggressor.

---

[3] Defendant also relied on the hospital's discharge summary report to support his claim that the reason for intubation was misrepresented. This report, which states that Batista was intubated "because of combativeness," states that it was produced on June 13, so it was not available to Hernandez when he prepared the affidavit on June 12. In any case, we assume that Hernandez knew that Batista was combative.

We agree with the superior court that the misrepresentations and omissions were not material and did not impact the affidavit's presentation of probable cause. Defendant contends that a reconstituted affidavit, without the omissions and misrepresentations, would have failed to establish probable cause that a crime had occurred and that defendant was the perpetrator.

Had Hernandez fully and accurately disclosed all of the facts stated in the police reports about who was the aggressor, how many people were involved, and the nature of Batista's injuries, the affidavit would still have shown that a confrontation occurred between Batista and the man with the hammer, that Batista did not use any weapons, that the man with the hammer hit Batista in the head with the hammer, and that Batista suffered a significant injury to his head. While a reconstituted affidavit would have left open the possibility that the man with the hammer had acted in self defense, it still would have demonstrated a fair probability that the man's use of a hammer on Batista constituted an assault because it exceeded the force reasonably necessary to repel Batista. Hence, the reconstituted affidavit would still have supported a finding that there was a fair probability that the man who hit Batista with a hammer had committed a crime.

A reconstituted affidavit also still would have supported a finding that there was a fair probability that the man with the hammer was defendant. Jacobson was fairly sure that defendant's photo depicted the man with the hammer. The description given by Toews, while fairly generic, was consistent with defendant's description. The fact that the man with the hammer had a blue nose pitbull when first seen and then did not have the dog when he returned a few minutes later strongly indicated that the man had left the dog at a nearby residence. Defendant's house was near the park. Both times the man left the park he walked down the street where defendant's house was located in the direction of defendant's house. A blue nose pitbull was in defendant's yard after the confrontation. The presence of "random hammer indentation marks above the garage door" of defendant's home suggested that a hammer user and his hammer would be found within

7

this house.  Defendant's history of violence and his threatening note suggested that he might be disposed towards a violent attack on a stranger.  The confluence of these facts was easily sufficient to support a fair probability that the man with the hammer was defendant and that he and his hammer had returned to his home after the assault.

Since defendant failed to show that a reconstituted affidavit would have failed to establish probable cause, the superior court did not err in denying his motion without an evidentiary hearing.

### III.  Disposition

The order is affirmed.


_____
Mihara, J.


WE CONCUR:



_____
Premo, Acting P. J.




_____
Grover, J.


8